Field, adm'r, *vs.* Leak.

E. E. FIELD, administrator of ELIJAH M. FIELD, deceased, plaintiff in error, *vs.* JOHN F. LEAK and WM. W. LEAK, makers, and HENRY P. FARROW, endorser, defendants in error.

NOTE.—WARNER, C. J., did not preside in this case.

New trial granted because the verdict is decidedly and strongly against the weight of evidence.

Assumpsit. Scaling Ordinance. Tried before Judge MILNER. Bartow Superior Court. March Term, 1867.

This action was founded on three promissory notes, as follows:

" On or before the first day of September next, we, or either of us, promise to pay Henry P. Farrow, or bearer, the sum of seventeen hundred and fifty ($1750 00) with interest from date for value received. Witness our hands and seals, this the 5th day of September, 1861.

A. J. MILNER.

J. F. LEAK, [L. S.]
W. W. LEAK, [L. S.]"

This note had on it receipts signed by Farrow for $95 00, Sept. 14th, 1861; $475 00, Oct. 22d, 1861 ; $29 50, Nov. 15th, 1861 :

"On or before the first day of January, 1864, we, or either of us, promise to pay Henry P. Farrow, or bearer, the sum of two thousand dollars ($2000 00) for value received, with interest from date. Witness our hands and seals, this the 5th Sept., 1861, the interest to be paid annually, and if not paid, to become principal.

J. F. LEAK, [L. S.]
W. W. LEAK, [L. S.]

A. J. MILNER. I sign this note as gurantor."

The third note was exactly like the second, except that it became due "on or before the 1st day of January," 1865. All of these notes were endorsed by H. P. Farrow.

The defendants plead the general issue and that said notes had been paid and discharged because they were intended to

be paid in Confederate States Treasury Notes, and such Treasury Notes were tendered in payment at the maturity of each of said notes.

On the trial plaintiff introduced said notes and closed.

The defendants then offered as a witness said Farrow.

Plaintiff objected to his testifying on the ground of incompetency, because the endorsee of the notes sued on was dead. This objection was overruled.

FARROW then testified that on the fifth day of September, 1861, he sold to John F. Leak a tract of land near Cartersville, Ga., containing one hundred and fifty, or one hundred and sixty acres, and also the crop on the land, and some mules, cows, wagon, hack and household furniture, and took therefor said notes; that at the time of the sale he estimated the land at four thousand dollars, and considered the other property worth ($1750.00) seventeen hundred and fifty dollars, that there was no distinct contract as to any part of the property, but the whole was sold for the amount set out in the notes, that in 1858 witness bought the land and gave therefor forty-five hundred dollars, ($4500.00) and thought that the land was worth what he gave for it, and that purchase was made on a gold basis; that in the spring of 1862, he sold said notes to E. M. Field, and took therefor Confederate money and endorsed the notes.

Attorneys for plaintiff objected to proof of what kind of currency Farrow took in payment for said notes.    The Court overruled this objection, admitting it, he says, " as a fact which the jury might consider only in arriving at the intention of the parties as to the currency in which the notes were to be paid.

FARROW further testified, that nothing was said at the time of the sale as to the currency in which said notes were to be paid, the money then in circulation was bank bills, he expected to take currency in payment of the notes, that it was expected that there would be a war currency, and it was the expectation and intention of the parties that the notes should be paid in currency in circulation at the time the notes should fall due.  Witness thought some Confederate money was in circula-

tion at the date of the notes and it was then about equal to gold. Witness would not have taken the amount set out in the notes for the property sold, in a currency worth only forty for one, or twenty for one; the credit on one of the notes were given for the property received of J. F. Leak, being some of the property sold by witness to said Leak; no money was paid to witness on either note.

The defendants then read in evidence the answers of Moses A. Leak to interrogatories. He testified that he knew that such notes as those sued on, were given; witness, as agent for J. F. Leak, tendered Confederate money to said E. M. Field, and such tender was intended as a payment for said notes; the tender was made in Marietta, Ga., in the fall of 1863, for the notes then due, but he did not remember how many of said notes were then due; he proposed then to pay all that was then due. In the summer of 1864, just before the falling back of the Confederate army, witness made a tender of Confederate money, proposing to pay off all the notes that were then due from J. F. Leak to E. M. Field; this second tender was made in Atlanta, Ga. Witness heard E. M. Field admit that J. F. Leak had made him a tender of Confederate money as a payment for the first of said notes. E. M. Field admitted to the witness that his brother, J. F. Leak, had made a tender of Confederate money for the first note, and he (Field) refused to take it, and told witness that he was sorry that J. F. Leak had become offended at him for refusing to take the money, as he (Field) had learned. Witness' brother, J. F. Leak, observing to Field that he was and had been in the army all the while, Field observed that he was in the army also, and J. F. Leak replied that Field was in a State shoe-shop, while he (Leak) was in the front, and did not know when he might be killed, and that he desired to pay off those notes as they became due, that his family might not be encumbered with them in the event of his death.

In answer to the cross-interrogatories, the witness said, as to the consideration of the notes, all that his brother, J. F. Leak bought from Henry P. Farrow was summed up together and divided into annual payments, including land and other

Field, adm'r, *vs.* Leak.

property, the land is in Bartow county, 4th district, 3d section, on the road from Cartersville to Cassville, two and a half miles from Cartersville, adjoining lands of Willis Benham, Dr. Leeland and others, near the Western and Atlantic Railroad.   The property purchased from Farrow by J. F. Leak, consisted of land, some stock and some furniture.   The witness does not recollect the precise number of acres of land— between one and two hundred acres.   Witness has no recollection of any corn in the purchase, but he recollects two mules, one horse, one hack and three milch cows were in it. J. F. Leak resides on and exercises control over the land. Witness tendered all that was due at the time each tender was made; E. M. Field refused to receive the money.   Witness specified neither the amount due nor that tendered at the time of the tender, though he was asked to state the amounts.   The precise date of the tenders not recollected; the first was in fall of 1863, and second in summer of 1864.   It was at the time of the tender that Field repeated the conversations aforesaid.   Witness is twin-brother of J. F. Leak.

JOHN F. LEAK was offered as a witness for defendants, and was objected on the same ground for which Farrow was objected to.   The Court overruled the objection.

He then testified he expected and intended to pay the notes in whatever was the currency of the country, but nothing was said as to what currency the notes were to be paid in.

WILLIAM W. LEAK was then examined and swore that nothing was said as to what currency was to be paid, but he expected they were to be paid in whatever might be the currency of the country; that a war currency was expected at the time the notes were given, and the expectation and intention of the parties was that the notes would be paid in that currency, and that he would not have signed the notes if he had not believed at the time the notes were given, that the war currency would be taken in payment when the notes were due.   The witness thought the price promised for the property was more than it was worth.   On the 1st of September, 1862, Confederate money was two for one; on the 1st

of January, 1864, it was twenty for one, and on the 1st of January, 1865, it was fifty for one.

L. M. MUNFORD was then introduced and testified that he was acquainted with the land sold by Farrow to Leak. About the time of the sale, the land was worth fifteen or sixteen dollars per acre, and is now worth seven or eight or ten dollars per acre.

Defendant closed.

Plaintiff in rebuttal, introduced JOHN A. ERWIN, who testified that on the 5th of September, 1861, he knew of no Confederate money in circulation ; bank-bills were then the currency of the country, and continued to be so until some time in 1862. According to the Broker's table, Confederate money, on the 5th of September, 1861, was ten per cent. discount, and was so from July to October, 1861; the first Confederate money witness knew to be in circulation, was about the last of 1861, or the first of 1862.

Plaintiff also examined C. DODD, whose evidence was that he went to Richmond about three or four weeks after the first battle of Manasses, and found a little Confederate money in circulation. In this region of the country bank-bills continued to be the currency of the country till late in the spring of 1862. Bank-bills depreciated greatly during the war, and are now worth very little—some five, some ten, some twenty cents in the dollar, and some more.

The plaintiff then introduced J. A. HOWARD, who testified that said land, at the date of the notes, was worth about thirty dollars per acre, and was now worth about twenty-five to thirty dollars per acre; that some time ago J. F. Leak asked thirty dollars per acre for it, and spoke of its having a valuable slate mine on it; that the land is worn and not worth as much as when Anthony Caldwell lived on it.

J. A. W. JOHNSON testified on behalf of the plaintiff that on the 5th of September, 1861, no Confederate money was circulating here; the first he saw was in latter part of 1861, or first part of 1862 ; as an officer of the army he was paid off in April, 1862, at Savannah, Ga., in the bills of the Marine Bank of Georgia; witness was on the coast in the latter part

Field, adm'r, *vs.* Leak.

of 1861 and the first part of 1862, and thinks he was in this county in the latter part of 1861.

The plaintiff also examined J. W. PRITCHETT, who testified that in the fall of 1866 he was a land agent, and as such, was employed by Leak to sell said land for him, and was instructed to ask forty dollars per acre for it, and was not authorized to take less for it. Witness did not think it was worth so much. Leak spoke of a slate mine on it as an inducement to purchasers, but no special importance was attached to it. Witness went with two or three parties with a view of selling the land, and did not succeed in selling it.

The plaintiff rested his case here.

The defendants in surrebutter, examined T. W. DODD, who testified that on the 10th September, 1862, he was paid off in Confederate money at Richmond, Virginia; on the 10th November, 1861, he came to this county, and Confederate money was regarded as a curiosity. At the time witness was paid off he could go to the Brokers in Richmond, Virginia, and get for a five dollar bill (Confederate money) three dollars in specie and two dollars in the Brokers' shin-plasters, which continued to circulate about as Confederate money.

The evidence being closed and argument had, the Judge charged the jury that while the testimony as to tender might not prove a legal tender according to the rule laid down by the Court, yet the jury might consider the testimony as to the tender in adjusting the equities between the parties; that the evidence of Farrow as to selling said notes for Confederate currency, could only be considered by the jury in arriving at the intention of the parties at the time the notes were made as to the kind of currency in which they were to be paid; that Farrow had a right to dispose of the notes as he pleased, and the defendants could not claim anything by it.

The verdict was for one thousand and twenty-five dollars and sixty-six cents, ($1,025.66) with costs of suit.

The plaintiff moved for a new trial on the grounds:

1st. Because the verdict was contrary to the charge of the Court, to the law, to the principles of equity and justice, and strongly and decidedly against the weight of the evidence.

Field, adm'r, *vs.* Leak.

2d. Because the Court allowed H. P. Farrow and J. F. Leak to testify.

3d. Because H. P. Farrow was permitted to testify that he sold said notes for Confederate money, and that he expected to take currency in payment for the notes, and J. F. and W. W. Leak were permitted to testify that they expected to pay the notes in whatever might be the currency in the country over plaintiff's objection thereto.

4th. Because the Court erred in charging as aforesaid as to the tender.

5th. Because after the jury had been charged and had retired to consider their verdict, and before they had found their verdict, one of them (W. F. Weems) separated from the jury and applied to J. R. Parrott, Esq., one of defendants' attorneys, for a schedule of the prices of gold and Confederate money, and got the same from said Parrott.

This last ground was accompanied by the affidavits of said W. F. Weems and C. B. Conyers, two of the special jury, who substantially swore that the jury had agreed to give the value of the Confederate money at the maturity of the notes, and as Mr. Erwin had held a schedule in his hand and testified by it, the schedule was sent for only to assure them in their recollection of Erwin's valuations, and that nothing was said but asking for the schedule, and the verdict was not influenced by it, except in assuring the jury that they properly recollected the testimony of Erwin.

The Court refused to grant a new trial, and upon the grounds aforesaid said refusal is assigned as error.

Samuel Weil, Geo. N. Lester, for plaintiff in error.

Wofford & Parrott, for defendants in error.

Field, adm'r, *vs.* Leak.

WALKER, J.

We have repeatedly said that by the ordinance "to adjust the equities between parties," more than the ordinary discretion is delegated to juries, and their finding should be respected, except in cases where manifest wrong has been done. To this ruling we still adhere; but this case comes within the exception.

The plaintiff occupies the position that Farrow formerly did. Farrow sold and Leak purchased about five thousand dollars worth of property, on the 5th of September, 1861; and by the contract Leak was to pay to Farrow, or bearer, that sum with interest, payable annually. The property, at the time of the sale, was worth in gold well nigh the sum promised for it. Five years and six months after the trade, the jury found a verdict for one-fifth of the original sum promised to be paid, without interest, and in a currency worth but three-fourths of what currency was worth at the time of the trade! Can any one seriously contend that this is a verdict rendered on principles of equity and justice?

There were scarcely any Confederate notes in circulation at the time the contract was made; and those few were about as good as gold. Farrow swears he would not have sold his property for such currency as the jury found the notes payable in. Not a word was said by any of the contracting parties at the time, as to what sort of currency the notes should be paid in, except what they said in the notes—the best evidence of what the contract was. In the notes the word "dollars" is used, which, according to Mr. Webster, means "silver coin," each "of the value of one hundred cents." Shall the Court and jury interpolate into this contract the words, "Confederate notes," because the parties expected that there would be a war currency, and the notes would be payable in such currency? Was there any such contract? We are not able to find any evidence of it in the record.

If there be then no evidence that the notes were payable in "Confederate notes," is there any other ground on which this verdict can be sustained? Has the property so depreciated

Field, adm'r, *vs.* Leak.

by the events of the war, as to make, upon equitable principles, this verdict right, supposing the jury to have authority to adjust the equities on this basis? There is not a single witness who testifies that the land, without counting the personal property, was worth, at the time of the trial, less than the amount of the verdict; and the weight of the evidence shows it was then worth two or three times as much as the amount the jury found. Upon no hypothesis, under the facts of this case, can this verdict be sustained. We feel loth to control the verdict of a jury, under this ordinance, but we are sure that it is our duty to do so in this case.

We are aware of the difficulties in the way of laying down general rules by which to govern the great variety of cases which may arise under this ordinance. Judge Harris thinks that we should do so; and that the value of the consideration received, at the time of the trade, should be the criterion by which to adjust the equities between the parties. The other members of the Court do not think it best to adopt this as a rule applicable to all cases. In some cases it may be the correct rule; in others it might work great injustice. Let the Courts and juries carry out the provisions of the ordinance in its spirit, and they will find this Court ready to affirm their verdicts and judgments. But when a case, showing such manifest wrong as this exhibits, shall be brought before us, we will unhesitatingly reverse the judgment and award a new trial.

Judge Harris thinks a new trial should be granted on the ground numbered "5" in the Reporter's statement of facts. As we grant a new trial on the merits, perhaps it is unnecessary to pass formally upon this ground.

Judgment reversed.